## Case No. 5,206.

### GALPIN v. PAGE.

[3 Sawy. 93;[1] 3 South. Law Rev. 712; 1 Am. Law T. Rep. (N. S.) 523; 1 Cent. Law J. 491.]

Circuit Court, D. California. Aug. 31, 1874.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

John B. Harmon, for plaintiff.
Williams & Thornton, for defendant.

FIELD, Circuit Justice. The material questions presented for consideration in this case have already been determined by the recent decision of the supreme court of the United States. It is unnecessary, therefore, to repeat at large the facts of the case; they are given in the report of the decision in 18 Wall. [85 U. S.] 350. It will be sufficient to state here its general features. The action is ejectment for the possession of certain real property situated within the city of San Francisco, both parties deraigning title from the same source. Franklin C. Gray, deceased, who died in the city of New York in July, 1853, intestate, seised of the premises in controversy. The plaintiff claims through conveyances executed by direction of the probate court of the city and county of San Francisco, which administered upon the estate of the deceased. The defendant claims under a purchaser at a commissioner's sale, had under a decree of a district court of the state, having jurisdiction in that city and county, rendered in a suit brought to settle the affairs of alleged copartnerships between the deceased and others. The case turns upon the validity of this decree and the commissioner's sale had under it.

The suit in which that decree was rendered was one into which two suits, brought by different parties, had been consolidated. One of them was brought in 1854, by William H. Gray, a brother of the deceased; the other was brought in 1855 by Cornelius J. Eaton, who had been at one time a clerk of the deceased. Each of these complainants alleged a separate, distinct and dormant copartnership between himself and the deceased, which embraced the commercial business in which the latter was engaged and all his real estate transactions. Gray alleged that his interest in the business and property of the copartnership formed between him and the deceased was one-third. Eaton claimed that his interest in the business and property of the copartnership formed with him was one-fourth. Each of these complainants, alleging a universal and dormant copartnership between himself and the deceased, denied, one of them under oath, any copartnership of the deceased with the other. Subsequently, however, they consented to a consolidation of their suits; and four days afterwards, a decree was entered, and it would seem from the certificate of the judge appended to the decree that it was by consent of the parties, adjudging that each had been a copartner with the deceased as alleged by him, and that both of these copartnerships, dormant and unknown to each other as they were, embraced all the property and all the business of the deceased.

By the decree a reference was ordered to a commissioner to take an account of the business, profits and property of the two copartnerships, with directions, upon the confirmation of his report, to sell all the property, real and personal, of both copartnerships, and to execute proper conveyances to the purchasers. At the sale which subsequently took place, one of the attorneys of the complainant, Gray, became a purchaser of the premises in controversy. He afterwards conveyed an undivided half to his law partner, and devised the other undivided half to the defendant. His law partner some years later transferred his interest also to the defendant.

The deceased, Franklin C. Gray, left surviving him a widow, Matilda C. Gray, of whom a posthumous child was born in December following, named Franklina C. Gray. By the law of California the estate of the deceased vested in the widow and child in equal shares; and they both were made parties to the suits of Gray and Eaton; in the first suit the child being made a party by a supplemental bill. Both were non-residents of the state of California and residents of the state of New York; and their absence from this state and residence in New York were averred in the pleadings. Constructive service upon them, by publication under the statute, was therefore attempted. The widow appeared; and upon representation that service had been made upon the infant, a guardian ad litem was appointed for her, and he consented to the consolidation of the two suits, and, it would seem, to the decree rendered.

Subsequently, upon appeal to the supreme court of the state, the decree of the district court in the consolidated suit was reversed, on the ground that no sufficient service of summons had been made upon the infant Franklina in the case brought by Eaton; and that, until such service, no guardian ad litem could be appointed for her; and on the additional ground that the evidence presented had not established a copartnership between William H Gray and the deceased. The case was accordingly remanded to the district court; and subsequently the two suits, after being on the calendar for trial for nearly a year, were dismissed. The plaintiff acquired his interest and brought the present action after this dismissal.

When the case was originally here [Case No. 5,205], the circuit court decided that the record in the suits of Gray and Eaton, in the district court, did not show that due service of summons by publication had not been made upon the infant Franklina, and as the district court was a superior court of general jurisdiction, it must be presumed to have had jurisdiction of the subject-matter and of the parties in those suits; and that, in consequence, the sale and conveyance under the decree, notwithstanding its subsequent reversal on the grounds stated, passed a good title to the purchaser; the court holding that where a record of a judgment of a superior court of general jurisdiction was assailed collaterally, it was not enough that the record did not affirmatively show jurisdiction, but that it must affirmatively show that the court did not have jurisdiction, or its judgment would be valid until reversed on appeal or vacated in some direct proceeding taken for that purpose. And so the court said that "at the time of the sale, a purchaser was entitled to rely upon the validity of the decree (in the consolidated suit) unless it affirmatively appeared on the face of the record that the court had no jurisdiction of the infant."

But the supreme court of the United States [18 Wall. (85 U. S.) 350] took a different view of the case, and held that the adjudication of the supreme court of the state, that no sufficient service of summons was ever made upon the infant Franklina, and that until such service no guardian ad litem could be appointed for her, was an adjudication that the jurisdiction of the district court over her had never attached, and that this adjudication was conclusive and binding upon the circuit court and every other court, when brought before it for consideration. Into its soundness the circuit court could not look; for it possessed no revisory power over the decisions of the supreme court of the state. The adjudication constituted the law of that case, and settled, for all possible controversies, the character of the decree of the district court. Rendered without jurisdiction, that decree was always void, so far as it affected the rights of the infant Frank-

lina, and unavailing to support any proceedings under it affecting her title.

But the supreme court of the United States in its decision went still further, and held that the rule stated by the circuit court, as to the presumptions which the law implies in support of the judgments of superior courts of general jurisdiction, was subject to many exceptions and qualifications and had no application to the case at bar; that such presumptions were limited to jurisdiction over persons within the territorial limits of the courts, persons who could be reached by their process, and also over proceedings which were in accordance with the course of the common law. In these latter particulars, the decision was in affirmation of doctrines asserted by the circuit court in an elaborate and carefully considered opinion, delivered in 1865, in the case of Gray v. Larrimore [Case No. 5,721], which grew out of the sale under the same decree of the district court which is now before us. The doctrines there asserted were followed in the subsequent case of Gray v. Murphy [Case No. 5,725]. and, until the decision of this case by the present circuit judge, were not regarded as open to contestation in the circuit court. In this case they were overruled by him upon the supposed obligation of the court to follow a decision of the supreme court of the state in Hahn v. Kelly, rendered in 1868 (34 Cal. 391). And to that case, frequent reference has been made by counsel on the present trial, and some of its positions have been pressed with great earnestness, as though they were decisive of the points now under consideration. That case was cited to the supreme court of the United States. Extracts from the opinion in the case constituted the principal argument before that court of one of the counsel of the defendants; and if its positions were not expressly mentioned in the opinion of that court, it was not because they had not been carefully considered.

That case was brought to quiet the title to a tract of land in Alameda county, and to restrain its sale. The plaintiff asserted title to the premises by virtue of a sale under a judgment recovered for the deficiency remaining of a mortgage debt, after application of the proceeds received upon a sale of the property mortgaged. The suit in which the mortgage was foreclosed and judgment for the deficiency rendered, was prosecuted without personal service upon the defendant, upon publication of summons; and the validity of the judgment was assailed upon the alleged ground that the attempted service of the summons by publication was defective and void. The decree, however, recited that it appeared to the court that the summons and complaint had been "duly served on the defendants according to law and the order of the judge of the court;" and the supreme court of the state held that this recital was a direct adjudication upon the point and was, as conclusive upon the parties as any other

fact decided, provided it did not affirmatively appear, from other portions of the record, that the recital was untrue. As there was no direct contradiction of the recital, and as no other objection than the one mentioned was taken, this ruling as to the effect of the recital disposed of the case and necessitated a reversal of the decree below. The court, however, in its opinion, did not confine its consideration to this point, but proceeded to lay down certain general rules as to the presumptions of jurisdiction attendant upon the judgments of superior courts of general, jurisdiction, and to declare what constitutes the record in this state of such judgments, and the conditions upon which they may be collaterally assailed. Among other things, it is asserted in substance, and so far as anything in an opinion can be deemed an adjudication, which is not necessary to the decision, it adjudged:

1. That a judgment of a court of general jurisdiction could not be attacked collaterally, except for matters apparent upon its record; that it was not necessary that the jurisdiction of the court should affirmatively appear upon the record, but that, in the absence from the record of matters affirmatively disclosing a want of jurisdiction, either over the subject-matter of the action or the person of the defendant, such jurisdiction would be conclusively presumed; and that this conclusive presumption prevailed in all cases without reference to the character of the proceedings, or the residence of the parties against whom they were taken.

2. That in this state such record of the court consists only of the papers and proceedings which compose what is designated in the Code of Procedure as the judgment-roll; and, where jurisdiction is exercised over persons without the territorial limits of the court by constructive service upon them by publication of summons, and judgment by default is rendered upon such service, the record need not contain certain material proceedings, without which jurisdiction cannot attach, or any recital or evidence of such proceedings, because the legislature has not directed such proceedings to be incorporated in the so-called judgment-roll.

We do not regard the case at bar as one where any collateral attack is made upon a judgment of a superior court of general jurisdiction. The decree in the consolidated suit of Gray and Eaton is not here attacked collaterally in any proper meaning of that term. The adjudication of the appellate court in the same case upon the character of that decree is not offered by way of collateral attack; it is the exhibition of the result of a direct proceeding with reference to that decree had on appeal. When we speak of a collateral attack we refer to the presentation of grounds of invalidity other than those which have been established by the prosecution of a writ of error or an appeal or some other direct proceeding to vacate the judg-

ment. We will nevertheless examine the positions advanced by the supreme court of the state in the case named.

Before proceeding, however, to this examination, it is proper to say a few words respecting the light in which the ruling of the state court in that case is to be regarded in this court, and the right of this court to look into the jurisdiction of a state court when its judgment is produced in evidence.

In the first place, the ruling of the state court in Hahn v. Kelly [supra], except so far as it gives a construction to the statute of the state, is not binding upon this court. In all that relates to the presumptions which attend the acts of the superior courts and the circumstances under which they may be assailed, it stands like the ruling of any other court, entitled to respect and consideration for the learning and ability of its members, but possessing no obligatory force. "Where private rights," says the supreme court of the United States, in Chicago City v. Robbins, 2 Black [67 U. S.] 429, "are to be determined by the application of common law rules alone, this court (and the same is true of the circuit court), though entertaining for state tribunals the highest respect, does not feel bound by their decision." "It is undoubtedly true in general," says the same court in another case (Olcott v. Supervisors, 16 Wall. [83 U. S.] 687), "that this court does follow the decisions of the highest courts of the states, respecting local questions peculiar to themselves, or respecting the construction of their own constitutions and laws. But it must be kept in mind, that it is only decisions upon local questions, those which are peculiar to the several states, or adjudications upon the meaning of the constitution or statutes of a state, which the federal courts adopt as rules for their own judgments." The ruling of the state court in Hahn v. Kelly, except so far as it gives a construction to the state statute, relates to matters of general law, and not to questions of a local character peculiar only to the state. If the ruling of the court be correct, it applies not merely to judgments of the superior courts of general jurisdiction existing in California, but to the judgments of such courts existing in all other states.

In the second place, whilst the courts of the United States are not foreign courts in their relation to the state courts, they are courts of a different sovereignty, exercising a distinct and independent jurisdiction, and are bound to give to the judgments of the state courts only the same faith and credit which the courts of another state are bound to give to them. And it is well settled, that neither the constitutional requirement, providing that "full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state," nor the acts of congress providing for the mode of authenticating such acts, records and proceedings,—May 26, 1790 [1 Stat. 122],

—and declaring that, "when thus authenti-cated, they shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the state from which the records are or shall be taken," precludes an inquiry into the jurisdiction of the court in which the judgment was given, or the right of the state to exercise authority over the parties, or the subject-matter of the judg-ment. As was said in Christmas v. Russell, 5 Wall. [72 U. S.] 305, the judgments of the courts of one state are not foreign judgments in another state under the constitution and act of congress, nor are they domestic judg-ments in every sense; because they are not the proper foundation of final process, ex-cept in the state where they were rendered; and they are open to inquiry as to the juris-diction of the court and notice to the de-fendant.

The act of congress goes, perhaps, further than the constitutional requirement, which relates to the faith and credit to be given in each state to the public acts, records and judicial proceedings of every other state, in-asmuch as it declares the effect of the rec-ords and judicial proceedings of the states when authenticated, as provided "in every court within the United States," thus mak-ing its provisions applicable to the national courts, as well as to the courts of the states. The power of congress to prescribe the man-ner in which the records of the states shall be proved in the national courts, and the effect which shall be given to them, is independent of the constitutional provision. Still the law is to have the same construction in its ap-plication to the national courts as to the state courts. It leaves untouched the general principle that the jurisdiction of every court is open to inquiry, when produced in the courts of another sovereignty.

The circuit court of the United States for the district of California has the same au-thority to examine into the jurisdiction of a state court of California, when its judgment is produced, as the circuit court of the Unit-ed States for the district of New York has, when the same judgment is produced before that tribunal. All the circuit courts of the United States have the same relation to the state courts; and each will take notice of and administer in proper cases the laws of the states. This court, for example, will take notice of, and, in a proper case, admin-ister the law of New York, just as it will take notice of and administer the law of this state. In all cases the jurisdiction of a state court may be inquired into; but the inquiry can proceed no further; the jurisdiction ex-isting, the merits of the controversy involved are not open to examination.

We recur now to the rulings in Hahn v. Kelly [supra]. The first position, that when a judgment of a court of general jurisdic-tion is produced in evidence, it can only be collaterally attacked for matters apparent upon its record, and that, in the absence of such matters, the jurisdiction of the court must be conclusively presumed, is with cer-tain qualifications and exceptions undoubt-edly correct. These qualifications and ex-ceptions arise where the proceedings or the parties against whom they are taken are without the ordinary jurisdiction of the court, and can only be brought within it by pursuing special statutory provisions. As we had occasion to observe in a previous case, "All courts, even such as are designated courts of superior or general authority, are more or less limited in their jurisdiction; they are limited to a particular kind of cases, such as civil or criminal; or to partic-ular modes of administering relief, such as legal or equitable; or to transactions of a special character, such as may arise upon the high seas; or to the use of particular process in the enforcement of their judg-ments." Norton v. Maeder [Case No. 10,351]. When we speak of a court of general juris-diction in civil cases, we do not mean one which has jurisdiction over all subjects and all persons and of all process; but we mean one which exercises a general jurisdiction in law or equity, according to the well-establish-ed principles known to those departments of jurisprudence, over subjects and persons within certain defined territorial limits. When a judgment of such a court is produ-ced, relating to a matter falling within the general scope of its powers, the jurisdiction of the court will be presumed, even in the absence of the formal proceedings or steps by which the jurisdiction was obtained; and such jurisdiction cannot ordinarily be as-sailed except on writ of error or appeal, or by some other direct proceeding. But when the judgment of such a court relates to a matter not falling within the general scope of its powers, and the authority of the court over the subject can only be exercised in a prescribed manner, not according to the course of the common law; or the judgment is against a party without the territorial limits of the court, who was not served with-in those limits and did not appear to the ac-tion, no such presumption of jurisdiction can arise. The judgment being as to its subject-matter or persons out of its ordinary juris-diction, authority for its rendition must ap-pear upon the face of its record. In other words, there is no presumption in favor of the judgments of courts of general jurisdic-tion, except as to matters and persons falling within the scope of that general jurisdiction. When the proceeding is special and outside of that general scope, either as to subjects or persons, the presumption ceases, and the rec-ord must show a compliance with the special authority, by which the extraordinary juris-diction is exercised. This doctrine is an ob-vious deduction from principle, and is sus-tained by adjudged cases almost without number in the highest courts of the several states, and in the supreme court of the Unit-

ed States. There is running all through the Reports the emphatic declaration of the common law courts, that a special authority, conferred even upon a court of general jurisdiction, which is exercised in a mode different from the course of the common law, must be strictly pursued, and the record must disclose the jurisdiction of the court. On this subject the cases speak a uniform language, with scarcely a dissentient voice.

The tribunals of one state have no jurisdiction, and can have none, over persons or property without its territorial limits. Their authority is necessarily circumscribed by the limits of the sovereignty creating them. Any exertion of authority beyond those limits would be deemed, as stated in D'Arcy v. Ketchum, 11 How. [52 U. S.] 174, in every other forum an illegitimate assumption of power, and be resisted as mere abuse.

But over property and persons within those limits the authority of the state is supreme, except as restrained by the federal constitution. When, therefore, property thus situated is held by parties resident without the state, or absent from it, and thus beyond the reach of the process of its courts, the admitted jurisdiction of the state over the property would be defeated, if a substituted service upon the parties were not permitted. Accordingly, under special circumstances, upon the presentation of particular proofs, substituted service, in lieu of personal service, is allowed by statute in nearly all the states, so as to subject the property of a non-resident or absent party to such disposition by their tribunals as may be necessary to protect the rights of their own citizens. In this state, the statute, in terms, allows a constructive or substituted service in all cases, whether upon contract or for torts, where the person on whom the service is to be made is a non-resident of the state or is absent from it, whether the action be directed against property within the state, or merely for the recovery of a personal judgment against the defendant. But so far as the statute authorizes, upon such substituted service, a personal judgment against a non-resident except as a means of reaching property situated at the time within the state, or affecting some interest therein, or determining the status of the plaintiff with respect to such non-resident, it cannot be sustained as a legitimate exercise of legislative power. A pure personal judgment, not used as a means of reaching property at the time in the state, or affecting some interest therein, or determining the status of the plaintiff, rendered against a non-resident of the state, not having been personally served within its limits and not appearing to the action, would not be a judicial determination of the rights of the parties, but an arbitrary declaration by the tribunals of the state as to the liability of a party over whose person and property they had no control. The validity of the statute can only be sustained by restricting its application to cases where,

in connection with the process against the person, property in the state is brought under the control of the court subjected to its judgment, or where the judgment is sought simply as a means of reaching such property or affecting some interest therein, or to cases where the action relates to the personal status of the plaintiff in the state.

Aliens at peace with the United States are allowed access to the courts of the states, and unless the statute be limited in its application as stated, we must accept the conclusion that personal judgments for torts by one alien against another, neither of whom has ever been within our borders, may be recovered without personal service, by publication, and subsequently enforced against any property belonging to the defendant, that may by chance be brought into the country. It would certainly be a strange application of the statute if an inhabitant of Asia could recover in that way in our courts a personal judgment for an alleged tort committed against him in his own country by one of his countrymen.

An attachment of the property of a non-resident is allowed by the law of this state in all actions upon contracts, express or implied. This remedy, with the ordinary power of a court of equity to enforce mortgages and other liens, and to take property into its custody where there is danger of its removal beyond the state or of being wasted, and the information imparted to third parties by filing a notice of lis pendens where an interest in real property is the subject of the litigation, affords sufficient protection to citizens of the state without the assumption of any territorial jurisdiction over non-residents. Be this as it may, any such assumption can find no support in any principle of natural justice or constitutional law.

"Where a party is within a territory," says Mr. Justice Story in Picquet v. Swan [Case No. 11,134], "he may justly be subjected to its process, and bound personally by the judgment pronounced on such process against him. Where he is not within such territory, and is not personally subject to its laws, if, on account of his supposed or actual property being within the territory, process by the local laws may, by attachment, go to compel his appearance, and for his default to appear, judgment may be pronounced against him, such a judgment must, upon general principles, be deemed only to bind him to the extent of such property, and cannot have the effect of a conclusive judgment in personam, for the plain reason that, except so far as the property is concerned, it is a judgment coram non judice. * * * The principles of the common law (which are never to be lost sight of in the construction of our own statutes), proceed yet further. In general, it may be said that they authorize no judgment against a party, until after his appearance in court. He may be taken on a capias and brought into court, or dis-

trained by attachment and other process against his property to compel his appearance; and for non-appearance be outlawed. But still, even though a subject and within the kingdom, the judgment against him can take place only after such appearance. So anxious was the common law to guard the rights of private persons from judgments obtained without notice and regular personal appearance in court."

"Jurisdiction is acquired," says the supreme court in Boswell's Lessee v. Otis, 9 How. [50 U. S.] 348, "in one of two modes: first, as against the person of the defendant by the service of process; or, secondly, by a procedure against the property of the defendant within the jurisdiction of the court. In the latter case, the defendant is not personally bound by the judgment beyond the property in question. And it is immaterial whether the proceeding against the property be by attachment or a bill in chancery. It must be substantially a proceeding in rem."

A substituted service is usually made in the form of a notice published in the public journals, as in this state. "But such notice," says Cooley (page 404), in his treatise on Constitutional Limitations, "is restricted in its legal effect, and cannot be made available for all purposes. It will enable the court to give effect to the proceeding so far as it is one in rem, but when the res is disposed of, the authority of the court ceases. The statute may give it effect so far as the subject-matter of the proceeding is within the limits and therefore under the control of the state; but the notice cannot be made to stand in the place of process, so as to subject the defendant to a valid judgment against him personally. In attachment proceedings, the published notice may be sufficient to enable the plaintiff to obtain a judgment which he can enforce by sale of the property attached, but for any other purpose such judgment would be ineffectual. The defendant could not be followed into another state or country, and there have recovery against him upon the judgment as an established demand. The fact that process was not personally served is a conclusive objection to the judgment as a personal claim, unless the defendant caused his appearance to be entered in the attachment proceedings. Where a party has property in a state, and resides elsewhere, his property is justly subject to all valid claims that may exist against him there; but beyond this, due process of law would require appearance or personal service before the defendant could be personally bound by any judgment rendered."

In Cooper v. Reynolds, 10 Wall. [77 U. S.] 308, similar doctrines are laid down by the supreme court of the United States. In that case, the plaintiff had sued the defendants in Tennessee for false imprisonment, and upon the return of the sheriff that none of them were to be found in his county, sued out a writ of attachment against their property.

Publication was ordered by the court, notifying them to appear and plead, answer or demur, or that the suit would be taken as confessed, and proceeded in ex parte as to them. Publication was had, and the defendants having made default, judgment was entered against them, and the attached property was sold under it. The purchaser having been put into possession, the original owner brought ejectment for the premises. In considering the character of the attachment suit, the court, speaking through Mr. Justice Miller, said: "Its essential purpose or nature is to establish, by the judgment of the court, a demand against the defendant, and to subject his property, lying within the territorial jurisdiction of the court, to the payment of that demand.

"But the plaintiff is met at the commencement of his proceedings by the fact that the defendant is not within that territorial jurisdiction, and cannot be served with any process by which he can be brought personally within the power of the court. For this difficulty the statute has provided a remedy. It says that, upon affidavit being made of that fact, a writ of attachment may be issued and levied on any of the defendant's property, and a publication may be made warning him to appear, and that thereafter the court may proceed in the case, whether he appears or not.

"If the defendant appears, the cause becomes mainly a suit in personam, with the added incident that the property attached remains liable, under the control of the court, to answer to any demand which may be established against the defendant by the final judgment of the court. But if there is no appearance of the defendant, and no service of process on him, the case becomes, in its essential nature, a proceeding in rem, the only effect of which is to subject the property attached to the payment of the demand which the court may find to be due to the plaintiff.

"That such is the nature of this proceeding in this latter class of cases, is clearly evinced by two well-established propositions: First, the judgment of the court, though in form a personal judgment against the defendant, has no effect beyond the property attached in that suit. No general execution can be issued for any balance unpaid after the attached property is exhausted. No suit can be maintained on such a judgment in the same court or in any other; nor can it be used as evidence in any other proceeding not affecting the attached property; nor could the costs in that proceeding be collected of defendant out of any other property than that attached in the suit. Second, the court, in such a suit, cannot proceed unless the officer finds some property of defendant on which to levy the writ of attachment. A return that none can be found is the end of the case, and deprives the court of further jurisdiction, though the publica-

tion may have been duly made and proven in court."

The writer of the present opinion thought some of the objections taken to the preliminary proceedings in the attachment suit referred to were well founded, and dissented from the judgment of the court; but in the doctrine laid down in the above citation he always has concurred. It is, in our judgment, the true doctrine, and the only doctrine which is consistent with any just protection to the citizens of other states. Such is the constant intercourse between citizens of different states at the present time that the greatest insecurity to property would exist, if purely personal judgments obtained ex parte, without personal citation, upon mere publication of notice, which, in the great majority of cases, would never be seen by the parties interested, could be made available for the seizure of property afterwards brought within the state. That law would be intolerable, if valid, which would permit citizens of another state to come into this state and recover personal judgments for all sorts of torts and contracts, upon mere service by publication against citizens of different states who have never been within the state or possessed any property therein. If such judgments could be upheld they would become the frequent instruments of fraud in the hands of the unscrupulous, and be sprung on the property of the unsuspecting defendants when the transactions giving rise to the judgments have passed from their memory, or the evidence respecting the transactions has perished. We do not think it within the competency of the legislature to invest its tribunals with authority having any such reach and force; certainly no presumption in favor of their jurisdiction can arise when a judgment of this character is produced against a non-resident who has never been within the state, and did not appear to the action. 1 Hare & W. Notes to Smith, Lead. Cas. p. 838; Picquet v. Swan [Case No. 11,135]; Monroe v. Douglass, 4 Sandf. Ch. 182.[2]

The second position laid down in Hahn v.

Kelly, requires us to consider what papers and proceedings constitute the record of a court of general jurisdiction, which may be looked into when a judgment of that court rendered against a person without the territorial limits of the court, upon constructive service by publication, is assailed collaterally for want of jurisdiction. In that case, it is held that such record consists only of the papers and proceedings which compose what is designated in the Code of Procedure as the judgment-roll; and that it need not contain the affidavit of the party and the order of the court, without which constructive service of the summons by publication can not be made.

The statute authorizing constructive service by publication of summons upon non-resident and absent parties, requires certain facts to be presented by affidavit to the court in which the action is pending, or to a judge thereof, or to a county judge. If it appear upon such presentation to the satisfaction of the court or judge that the facts exist, an order may be made for the publication of the summons, and such order must prescribe the period and designate the paper in which the publication is to be made; and if the residence of the defendant be known, the order must also direct a copy of the summons and complaint to be forthwith deposited in the post-office directed to him at his place of residence. The service of the summons is deemed complete at the expiration of the time prescribed by the order for publication.

The statute, in the same title which treats of the manner of commencing civil actions, after stating the manner in which service shall be made in case of personal service, and in case of service by publication, provides in sections almost immediately following, that "proof of the service of summons shall be as follows: 1. If served by the sheriff, his certificate thereof. 2. If served by any other person, his affidavit thereof. 3. In case of publication, the affidavit of the printer, or his foreman or principal clerk, showing the same; and on an affidavit of a deposit of a copy of the summons in the post-office, if the same has been deposited."

---

[2] In Oakley v. Aspinwall. 4 Comst. [4 N. Y.] 520. Mr. Chief Justice Bronson, in delivering the opinion of the court of appeals of New York, said: "When the courts of any state render a judgment against one who was not a citizen of that state, and was not brought into court, the judgment is held absolutely void everywhere else, although it may have been expressly authorized by the legislature of the state where it was rendered. I doubt whether such a judgment is of any force in the state where it was rendered. Under our form of government it is questionable, to say the least, whether the legislature can, in any case, without an express license from the people, authorize a judgment which shall operate in personam against a defendant who neither appeared nor was in any way served with process. The state must not boast of its civilization, nor of its progress in the principles of civil liberty, where the legislature has power to provide that a man may be condemned unheard." In Webster v. Reid, 11 How. [52 U. S.] 459, it appeared that the legislature of the territory of Iowa had directed that suits might be instituted against the owners of half-breed lands lying in Lee county in that territory, and notice be given to the owners through the Iowa Territorial Gazette. Suits having been instituted by notice in that way, and judgments recovered, the supreme court of the United States declared that they were nullities. "These suits," said Mr. Justice McLean in delivering the opinion of the court, "were not a proceeding in rem against the land. but were in personam against the owners of it. Whether they all resided within the territory or not, does not appear, nor is it a matter of any importance. No person is required to answer in a suit on whom process has not been served, or whose property has not been attached. In this case, there was no personal notice nor an attachment or other proceeding against the land, until after the judgments. The judgments, therefore, are nullities, and did not authorize the executions on which the land was sold."

In another part of the same statute, in a different title and chapter, treating of a different subject, "the manner of giving and entering judgment," it is provided that immediately after entering the judgment, in case the complaint be not answered, the clerk shall attach together the summons with the affidavit or proof of service, and the complaint with a memorandum indorsed thereon, that the default of the defendant in not answering was entered, and a copy of the judgment; and that these papers shall constitute the judgment-roll in the case.

Now, it is evident that the language of the statute in the first title mentioned, declaring what shall be proof of service of the summons, must be limited to the action of the persons making the service or publication, of which the sections immediately preceding in the same title speak; as if the language were as follows: "Proof of the service of summons by the sheriff or other person, or by a publisher of a newspaper, as above provided, shall be as follows." The obvious meaning intended is, that the proof of service, which the parties performing the particular duty prescribed must furnish, shall be the certificate or affidavit designated. It does not mean that such certificate or affidavit shall be all that is required on the subject of service, but only all that is required of those particular persons. Any other construction would lead to this absurd result, that an affidavit could be used to establish conclusively a fact to which it makes no reference. Publication of a summons, in a newspaper is not service of the summons, nor is an affidavit of such publication proof of service. The publication, to be of any avail, must be in a paper designated, and for the period prescribed by the order of the court or judge. The terms of such order must therefore be connected with the affidavit, or the proof will amount to nothing. The affidavit by itself is only a portion of the proof, a solitary link in the chain required. The printer is not supposed to know anything of the order, and is not called upon even to refer to it in his affidavit.

When, therefore, the record of the judgment comes to be made up, it must necessarily include the order of the court, or it will disclose no proof of service. And when the statute requires the clerk to attach with other papers the proof of service, it means not merely the affidavit which the publisher may furnish as part of such proof, but the order also, without which the affidavit establishes nothing. It is in giving to the provision, declaring the proof which the officer or person making personal service or the printer publishing the summons shall furnish of their acts, the effect of a declaration that no other proof of the service was necessary, that error in our judgment was committed in Hahn v. Kelly [supra].

That the ruling in that case left the judgment-roll a defective and imperfect record,

seems to have been felt by the court. for it says: "In our judgment, it would have added to the completeness of the record to have made the proof of service by publication include, also, the affidavit of the party, and the order of the court directing publication to be made, for, in point of law, they constitute a part of the mode; but the legislature has not seen proper to do so, and we can no more add to their will than we can take from it."

For the reasons we have stated, we do not admit that the statute sanctions any such defective record; but, on the contrary, we are clear that, properly construed. it requires full proof of the jurisdictional facts to be incorporated into the judgment-roll.

If, however, we are mistaken, and the order, which is the foundation of and the only authority for the publication, is no part of such roll, or, if not mistaken, we are bound to accept as correct, the construction of the statute given by the state court, then inquiry into the jurisdiction of the court cannot be limited, on a collateral attack, to the contents of the roll. The remaining record of the proceedings would be of equal authority and verity, and could be equally relied upon. The record at common law, which imported absolute verity, was a history of all the acts and proceedings in the action, from its initiation to final judgment, enrolled upon parchment for a perpetual memorial and testimony. These rolls were called records of the court, and were, in the language of Blackstone, "of such high and supereminent authority, that their truth was not to be called in question." A record, professedly embracing only a portion of such acts and proceedings, cannot be entitled to similar implicit credit, and cannot equally close the door against collateral attack. The use of the same designation to indicate a different collection of acts and proceedings, cannot, of course, carry with it the same import. If the legislature should declare that only that portion of the proceedings in an action, which constitutes the judgment itself, should be enrolled, it would not be any less illogical to insist that to that enrollment parties should be confined when questioning the jurisdiction of the court, than it is that they shall be confined to any other defective record of the proceedings in the action.

When constructive service by publication in a personal action is authorized by statute in place of personal citation. the rule prevailing in all courts is, that the statute must be strictly pursued. We are not aware that this doctrine has been denied in any state court. It has been repeatedly asserted by the supreme court of this state in the most emphatic manner. "A contrary course," said that court in Jordan v. Giblin, in 1859, "would encourage fraud and lead to oppression." 12 Cal. 100. "A failure to carry out the rule thus prescribed." said the court, speaking through Mr. Justice Sanderson, in Ricketson v. Richardson. 26 Cal. 149, "in any

particular is fatal where it is not cured by an appearance." In Forbes v. Hyde, 31 Cal. 342, decided in 1866, the same doctrine is recognized. There the objection to the insufficiency of an affidavit made to obtain an order of publication, was allowed on a collateral attack to the judgment under which the plaintiff claimed title in ejectment. As the statute only requires certain facts to appear by affidavit to the satisfaction of the court or judge, we should be inclined, in the absence of this decision, to hold that defects in the affidavit could be taken advantage of only on appeal, and could not be urged collaterally. We cite the case, however, not only because it reiterates the rule of strict construction, but because of the special reason it gives for its enforcement in this state, in the observation that there is probably "no state in which so many have waited and are still waiting for their adversaries to depart in order that suit may be brought and judgment obtained against them on publication without actual notice." "It may be important," continues Mr. Justice Sawyer, in delivering the unanimous opinion of the court, "to the interests of those who suppose they have acquired rights under this class of judgments, that they should be upheld. But it is equally important that the interests of parties who have only been constructively served with process, and who, in many instances, have had no actual notice till they have been condemned unheard, should be protected. If a judgment is void for want of jurisdiction, all those who have acquired interests under it have done so in full view of the condition of the record; while, on the other hand, a defendant is liable to have an unjust judgment rendered against him without any knowledge of the pendency of the action till it is too late to protect himself. An appeal is no adequate remedy where a party has no notice; for the time to appeal is very brief, and may expire before actual notice is obtained. In the language of the court in Smith v. Rice, 11 Mass. 512, 'The very grievance complained of is, that the party had no notice of the pending of the cause, and of course no opportunity to appeal.' "

Now, if the rule in Hahn v. Kelly be correct, we have this singular result: that whilst the statute must be strictly followed before jurisdiction can be acquired over the person, a party against whom a judgment is rendered is precluded from examining the proceedings, by which alone it can be seen whether the statute has been followed. In other words, the court says no jurisdiction is acquired by the court if the requirements of the statute be not pursued, but the record of the proceedings taken shall always be a closed book.

If the order of the court is no part of the judgment-roll it cannot be brought before the court on appeal, unless a statement or bill of exceptions be made up; and either of these proceedings supposes the presence of the parties or counsel. If any other direct proceedings are taken they might result in vacating the judgment; but under the ruling in the case cited, the record being regular on its face, the purchaser, if a third party, would be protected, and the wronged defendant be left to the doubtful chances of recovering the value of his property by action against the plaintiff.

From the examination we have thus been able to give to the case of Hahn v. Kelly, we do not find in it sufficient reasons to depart from the old and well-established rules formerly recognized in the supreme court of the state, the observance of which, as we are more and more impressed every day, is essential to the protection of the rights of all citizens, whether resident or non-resident of the state.

The proceedings for constructive service by publication, which the statute authorizes, are, as stated by Mr. Justice Sanderson in the case of Ricketson v. Richardson [supra], "in derogation of the common law"; that is, they are not in accordance with the course of the common law.

It was the boast of that law that it condemned no one in his person or his property without his day in court. That there must be citation before hearing, and hearing, or opportunity of being heard, before judgment, was a cardinal principle which pervaded all its judicial proceedings. And when the articles of compact contained in the ordinance of 1787, for the government of the Northwest Territory declared that its inhabitants should always be entitled "to judicial proceedings according to the course of the common law," it was believed by them that they had in that guarantee the assurance of full protection to all their private rights; and that the language was not used "mainly for ornamental purposes," having a certain "rotundity of sound which is pleasing to the ear" but leaving "no definite impression upon the understanding." [3] Hahn v. Kelly, 34 Cal. 411. The common law recognized no such proceeding as a personal judgment without the appearance of the party, and probably in no other case than Hahn v. Kelly were proceedings to outlawry ever

[3] In speaking of these terms—"proceeding according to the course of the common law"—the court, in Hahn v. Kelly, uses this language: "Some words are used to express ideas, and others to ornament them. The more we turn this expression over, and examine it by the light of reason, for the purpose of determining to what use it has been put, the more we are inclined to the opinion that it has been used merely from force of habit, or mainly for ornamental purposes. It has a certain rotundity of sound which is quite pleasing to the ear, but leaves no definite impression upon the understanding. It is simply equivalent to a knowing look or a solemn shake of the head, and doubtless it was first used in that sense. When first employed, its use was harmless, for there was then no mode of procedure except such as the common law prescribed, but its continued use where the modes of the common law have been superseded is mischievous."

cited as a mode "amounting or equivalent to constructive service," by which a common law court obtained jurisdiction. "By the strict rules of the common law," says the supreme court of New Jersey, in Hess v. Cole, 3 Zab. [23 N. J. Law] (116) 123, "it was necessary in every suit, not only that the defendant should be served with process, but that his appearance to the action should be effected. Every student is familiar with the cumbrous machinery and complicated process by which the courts sought to compel the appearance of the defendant. He is familiar also with the principle, that if the defendant was contumacious and refused to appear to a mere civil action, the proceedings were at an end. No judgment could be rendered. Every common law record shows upon its face that the defendant was either in custody, or was summoned or attached to answer to the action. And however inconvenient may have been the strictness with which the principle was applied, and the extent to which it was enforced in ancient common law proceedings, the principle itself is by no means peculiar to the common law. It pervades, in fact, every code of law and every well-regulated system for the administration of justice."

The opinion in Hahn v. Kelly is not only singular in its reference to proceedings to outlawry for want of appearance of a party, but the citations from Blackstone, to show that the courts of chancery would proceed to judgment upon a constructive service of process at all analogous to service by publication, establish nothing of the kind; and only seem to do so because they are detached from their context in the volume. They relate to proceedings to compel the appearance of parties after service of the subpoena, which is the original process in chancery, as any one will see who will read the whole page in Blackstone from which the citations are taken.

Service of the subpoena could indeed be made by leaving a copy at the actual residence of the defendant, as well as by delivering a copy to him personally. And in special cases where an absent or absconding defendant had appointed a person to act as his agent in the matter litigated, substituted service upon such agent in lieu of the principal was, upon application to the court, sometimes allowed. Adams' Eq. 324; Hobhouse v. Courtney, 12 Sim. 140. But it was not until the statute of 5 Geo. II. c. 25, that proceedings could be taken by publication without service in one of the modes indicated. That statute authorized proceedings by proclamation published in the London Gazette, and read in the parish church, and posted in the Royal Exchange, where a defendant had absconded to avoid service. It did not apply to a citizen or subject of another government who had never been in the realm.

Passing from Hahn v. Kelly, we proceed to consider the other positions taken by the defendant to defeat a recovery. It is contended by her counsel: 1. That the cases of Gray and Eaton were suits in rem, and that the decree in the consolidated suit bound the property without reference to the defective service of summons upon the infant. 2. That the district court had authority to appoint a guardian ad litem for the infant without previous service upon her; and 3. That the decree in the consolidated suit was not reversed as to the widow Matilda.

1. Suits in rem may be divided into four classes: 1st, those which are directed primarily against particular property, and are intended to dispose of it without reference to the title of individual claimants; 2d, those which are instituted to determine the status of particular property or persons; 3d, those which are, in form, personal suits, but which seek to subject property brought by existing lien or by attachment, or some collateral proceeding, under the control of the court, so as to give effect to the rights of the parties; and 4th, those which seek to dispose of property, or relate to some interest therein, but which touch the property or interest only through the judgment recovered. Proceedings in admiralty for the forfeiture of the vessel or goods are instances of the first kind; the suit is there brought against the vessel or goods directly, without reference to the rights of persons, and all parties are notified to appear by a designated day and assert their claims, or the property will be condemned. Proceedings in the probate court upon the validity of a will are instances of the second kind; the judgment, when rendered, operating directly upon the status or condition of the instrument, determining its validity or invalidity. Proceedings by attachment against the property of debtors, or to foreclose a mortgage, or other lien upon property, or to partition real estate, are instances of the third kind. Proceedings to compel the execution or cancellation of a conveyance of real property in the state and proceedings to wind up and dispose of partnership property are instances of the fourth kind. The third and fourth classes mentioned are not strictly proceedings in rem; but so far as they affect property in the state, they are treated as substantially such proceedings.

In proceedings in rem notice of some kind is required, but as all property is supposed to be in the possession of its owner, either in person or by agent, a seizure of property is, of itself, considered to impart notice of the proceeding to the owner. Therefore, where the property is, at the outset, taken into the custody of the court, the law is less strict in requiring further notice, either generally by proclamation to all persons, or specially to the reputed owner. But where the property to be affected is not thus at the outset taken into custody, there is no constructive notice given by the proceeding; and the same notice, as provided by law,

must be given to the defendant, as in actions where a personal judgment for damages is alone sought. "A proceeding," says the supreme court of Vermont, in Woodruff v. Taylor, 20. Vt. 65, where the law on the subject of suits in rem is stated with great clearness, "professing to determine the right of property where no notice, actual or constructive, is given, whatever else it might be called, would not be entitled to be dignified with the name of a judicial proceeding. It will be a mere arbitrary edict, not to be regarded anywhere as the judgment of a court."

The suits of Gray and Eaton were partly in personam, and were, at the same time, intended to subject property in the state to the disposition of the court; but as the property was not taken into custody at the outset, there was no constructive notice. given to the owners or claimants by the proceeding, and the absent and non-resident defendants could only be brought before the court by publication of summons, as provided by statute, and this, as the supreme court held, was never done, so far as the infant Franklina was concerned.

2. As to the authority of the district court to appoint a guardian ad litem for the infant without previous service upon her, it is sufficient to observe that the supreme court of the state on appeal decided that no such authority existed. The statute requires service of summons on all infants, before a guardian ad litem can be appointed, and makes no difference in this respect between an infant of a few months, and one nearly attaining his majority, and the service can no more be dispensed with in the one case than in the other. Besides, there is wisdom in the provision requiring service even upon an infant in its cradle, for the papers, through its nurse or relatives, would almost be sure in such case to find their way into hands of parties who would look after the interests of the child. Be this as it may, it is the proceeding required by the legislature before the jurisdiction of the court can attach; and as Chief Justice Taney said of a mere formal objection which was insisted upon in the supreme court, nothing is unimportant or to be disregarded which the legislature has prescribed as a condition for exercising the jurisdiction of the court. Where personal service cannot be made by reason of the non-residence in the state or absence of the infant, service must be made by publication as in other cases. Such publication is the prescribed condition to the exercise of jurisdiction over the infant.

3. The objection that the decree of the district court in the consolidated action was not reversed as to the widow Matilda, is not founded upon fact. There was but one decree, though the court speaks in its opinion as though there were two separate decrees before it. This is an evident inadvertence in the language of the court, arising from the fact that the objections to the validity of the decree were taken to the separate proceedings had before their consolidation. The case was remanded for further proceedings; and on filing the remittitur, the question evidently arose as to what proceedings should be had, and after hearing counsel for the parties, the court ordered a new trial on all the issues as to all the parties. Upon this order the case remained on the calendar of the district court for trial for over a year, and was then dismissed. The order of dismissal was entered in the consolidated suit, and it would appear for greater caution in the separate suits also.

The decree as to the infant Franklina being void for want of jurisdiction in the district court over her; all proceedings founded upon such decree, so far as her rights are concerned, necessarily partake of the same infirmity. The purchaser of the premises being one of the attorneys of the plaintiff Gray, the law, as held by the supreme court, imputes to him knowledge of the defects in the proceedings which were taken under his direction and that of his partners. The conveyance of the undivided half to his law partner was made after the reversal of the decree, and the latter also took his interest with similar knowledge of the defect. Independently of this fact, their title fell with the reversal of the decree. On this subject we can add nothing to what was said in the opinion of the supreme court, except that the doctrine of Reynolds v. Harris [14 Cal. 667] was reaffirmed in the late case of Reynolds v. Hosmer, reported in 45 Cal. 617.

As to the claim for rents, we are of opinion that the cost of filling up the water lot, which was a valuable and permanent improvement, is a just offset to the rents received or which might have been received by the defendant.

It follows from the views we have expressed that the plaintiff is entitled to judgment for the possession of the premises; and such judgment will be entered upon the findings filed, with costs.